J-A01033-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MARC J. SONNENFELD & JEFFREY SONNENFELD, AS CO-EXECUTORS OF THE ESTATE OF ROCHELLE G. SONNENFELD, DECEASED, AND MARC J. SONNENFELD AND JEFFREY SONNENFELD, IN THEIR OWN RIGHT | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : | |
| | : | No. 1988 EDA 2019 |
| v. | : : : | |
| THE MEADOWS AT SHANNONDELL RAFFI G. MEGARIAN, M.D. & DAVID GALINSKY, M.D.  & PAOLI HOSPITAL | : : : | |

Appeal from the Judgment Entered August 12, 2019
In the Court of Common Pleas of Montgomery County Civil Division at
No(s):  2014-23030

BEFORE:   NICHOLS, J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED MARCH 27, 2020**

Appellants, Marc J. Sonnenfeld and Jeffrey Sonnenfeld (Plaintiffs), appeal from the judgment entered following the denial of their Post-Trial Motion to remove the nonsuit the trial court granted at trial in favor of the Defendants Raffi G. Megarian, M.D., David Galinsky, M.D., and Paoli Hospital (collectively Defendants).[1]  We reverse and remand for a new trial with regard

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The fourth Defendant, The Meadows at Shannondell (The Meadows) settled before trial, and no claims against it are involved in this appeal.

to Dr. Galinsky. We affirm the judgment in favor of Dr. Megarian and Paoli Hospital.

The evidence presented at trial, viewed in favor of the Plaintiffs established the following. Mrs. Rochelle Sonnenfeld (Decedent) lived in assisted living from 2008 until approximately 2012. On June 11, 2012, Decedent moved into The Meadows, a combined skilled nursing facility and rehabilitation center, in order to prepare for a total right knee replacement scheduled for August 2012. Decedent was 94 years old and weighed approximately 90 pounds. N.T., 3/26/19 (9:20 a.m.), at 45. Dr. David Galinksy was Decedent's primary care doctor and had been since approximately June of 2007. *Id*. at 23. On June 13, 2012, Dr. Galinsky approved a prescription of 0.5 mg of Ativan every 8 hours PRN[2] for Decedent. *Id*. at 36. Ativan is a benzodiazepine, commonly known as a tranquilizer. *Id*. Dr. Galinsky approved a second prescription of 25 milligrams of Seroquel, to be administered at nighttime, to Decedent on August 1, 2012. *Id*. at 40; N.T., 3/26/19 (p.m.), at 98. Seroquel was administered to Decedent on August 1, 2012 at 9:00 p.m. N.T., 3/26/19 (9:20 a.m.), at 40. A prescription for 0.25 mg of Xanax, twice daily, was added by Dr. Galinsky and administered on August 2, 2012 at 5:00 p.m. *Id*. at 41. Xanax is also a benzodiazepine. N.T., 3/26/19 (p.m.), at 23. Xanax, Seroquel and Ativan are psychoactive or psychotropic medications. N.T., 3/26/19 (9:20 a.m.), at 49. Decedent was

---

[2] To be administered at the discretion of the registered nurse.

administered Seroquel on August 2, 2012 at 9:00 p.m. *Id*. at 41. Around midnight, Decedent was found on the floor next to her bed, having fallen. *Id*. at 42. The next morning, on August 3, 2012, Decedent was administered a dose of Xanax at approximately 9:00 a.m. *Id*. at 41. That same morning Dr. Megarian, an associate of Dr. Galinsky, met with Decedent at The Meadows. *Id*. at 42-44. Dr. Megarian sent Decedent to Paoli Hospital to be evaluated because of her fall. *Id*. Decedent was discharged from Paoli Hospital and returned back to The Meadows at approximately 5:00 p.m. that same day. *Id*. at 45. Decedent was given a dose of Xanax at 5:00 p.m. *Id*. Later that night, at 1:24 a.m., she was given a dose of Ativan. *Id*. On August 4, 2012 at 9:00 a.m. Decedent was again given Xanax. *Id*. On August 4, 2012, Paoli Hospital provided information to The Meadows that Decedent had critical levels of sodium deficiency, a condition called hyponatremia. *Id*. at 51. Upon receiving the information, on August 4, 2012, Dr. Megarian immediately sent Decedent back to Paoli Hospital. *Id*. at 51-52. Decedent died at Paoli Hospital on August 12, 2012. N.T., 3/25/19, at 21.

On December 8, 2014, Plaintiffs filed a complaint against Defendants alleging that the negligent prescription of Xanax, Ativan and Seroquel, and negligence in treating Decedent at Paoli Hospital caused Decedent's death from pulmonary edema and congestive heart failure. Plaintiffs alleged survival

claims[3] on Decedent's behalf as co-executors of the estate of Decedent, as well as wrongful death claims in their own right.[4]

A jury trial began March 25, 2019. At trial, Plaintiffs presented one expert witness, Dr. Fullerton. At the conclusion of *voir dire*, the trial court found Dr. Fullerton qualified as an expert in geriatrics, internal medicine, and administrative oversight of a medical facility. N.T., 3/26/19 (11:23 a.m.), at 35-36. The trial court precluded Dr. Fullerton from testifying as to areas of "cardiology, pulmonology, nephrology, ICU [Intensive Care Unit], cause of death and/or the propriety of treatment at Paoli [Hospital]." *Id*. at 33. The trial court based its preclusion on the Medical Care Availability and Reduction of Error Act (MCARE Act).[5] After Plaintiffs' expert witness testified and shortly before Plaintiffs closed their case on liability, Defendants moved for nonsuit and the trial court granted nonsuit in favor of each of the Defendants. Plaintiffs filed a timely post-trial motion to remove the nonsuit on April 5,

---

[3] See 42 Pa.C.S. § 8302 (Survival Act provides "[a]ll causes of action or proceedings, real or personal, shall survive the death of the plaintiff or of the defendant.").

[4] See 42 Pa.C.S.A. § 8301(a), (b) (providing that spouse, children, or parents of decedent can bring action "to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another").

[5] 40 P.S. § 1303.512.

2019. The trial court denied the motion on June 18, 2019. Plaintiffs filed this timely notice of appeal.[6]

Plaintiffs raise the following issues on appeal:

Did the Court err and abuse its discretion by precluding Plaintiffs' expert, John H. Fullerton, M.D. from testifying, during the course of trial, about cardiology, pulmonary medicine, nephrology, ICU, cause of death, and propriety of treatment at Paoli Hospital, because those fields of medicine are encompassed within his admitted areas of expertise of internal medicine, geriatrics, and administrative oversight, as applicable to this case, and thus within 40 P.S. Section 1303.512?

Did the Court err by granting the oral motion of counsel for defendants, Paoli Hospital, Dr. Megarian and Dr. Galinsky for non-suit before Plaintiffs had closed their case, where Plaintiffs' expert witness, in the totality of the circumstances, within a reasonable degree of medical certainty, unequivocally stated that there was a breach of duty via deviation(s) from the accepted standard(s) of care, which caused harm to Plaintiffs' decedent?

Plaintiffs' Brief at 4. We will address the second issue first.

Our standard of review for a nonsuit is as follows:

Pennsylvania Rule of Civil Procedure 230.1 provides that on oral motion of the defendant, the court may enter a nonsuit on any and all causes of action if, at the close of the plaintiff's case on liability, the plaintiff has failed to establish a right to relief. On appeal, entry of a compulsory nonsuit is affirmed only if no liability exists based on the relevant facts and circumstances, with the appellant receiving the benefit of every reasonable inference and resolving all evidentiary conflicts in the appellant's favor.

---

[6] This Court issued a rule to show cause on August 7, 2019, as judgment had not been entered in this case. On August 12, 2019, the trial court entered judgment in favor of Defendants. Therefore, we will treat the notice of appeal previously filed on July 2, 2019, as filed after entry of judgment. *See* Pa.R.A.P. 905(a)(5).

*Kiely on Behalf of Feinstein v. Philadelphia Contributionship Ins. Co.*, 206 A.3d 1140, 1145 (Pa. Super. 2019) (internal brackets, quotation marks and citations omitted); Pa.R.C.P. 230.1(a)(1). "[T]he lack of evidence to sustain an action must be so clear that it admits no room for fair and reasonable disagreement." *McClain ex rel. Thomas v. Welker*, 761 A.2d 155, 158 (Pa. Super. 2000) (internal citation omitted).

The essential elements of a negligence claim that the Plaintiff must prove are: the defendant owed him or her a duty, the defendant breached the duty, the plaintiff suffered actual harm, and a causal relationship existed between the breach of duty and the harm. *Grossman v. Barke*, 868 A.2d 561, 566 (Pa. Super. 2005). When alleging medical malpractice, determining whether there was a breach of duty requires a determination of the relevant standard of care and whether the defendant's conduct met that standard. *Caitlin v. Hamburg*, 56 A.3d 914, 920 (Pa. Super. 2012). In order to show causation in a medical malpractice action, "the plaintiff must show that the defendant's failure to exercise the proper standard of care caused the plaintiff's injury." *Freed v. Geisinger Medical Center*, 910 A.2d 68, 72 (Pa. Super. 2006) (internal citation omitted). In a medical malpractice claim, these elements must be proved by competent expert testimony. *Mitchell v. Shikora*, 209 A.3d 307, 315 (Pa. 2019). "A plaintiff in a medical negligence matter is required to present an expert witness who will testify, to a reasonable degree of medical certainty, regarding the standard of care (duty); that the acts of the physician deviated from the standard or care (breach);

and that such deviation was the proximate cause of the harm suffered." ***Id***. (citation omitted).

The trial court granted Defendant's motion for nonsuit as to Dr. Galinsky based on the fact that Dr. Fullerton did not use the key language that Dr. Galinsky breached the standard of care "within a reasonable degree of medical certainty." Trial Court Opinion (TCO) at 10. Plaintiffs argue this was error as Dr. Fullerton, in totality, unequivocally expressed his opinion to a reasonable degree of medical certainty that Dr. Galinsky breached the standard of care.

"In determining whether the expert's opinion is rendered to the requisite degree of certainty, we examine the expert's testimony in its entirety." ***Vicari v. Spiegel***, 936 A.2d 503, 510 (Pa. Super. 2007) (citation omitted). "That an expert may have used less definite language does not render their entire opinion speculative if at some time during his testimony he expressed his opinion with reasonable certainty." ***Carrozza v. Greenbaum***, 866 A.2d 369, 379 (Pa. Super. 2004), *aff'd* on other grounds, 916 A.2d 553 (Pa. 2007) (citation omitted). Moreover, an expert's opinion is not deficient purely because he or she failed to use the specific words, "reasonable degree of medical certainty." ***Vicari***, 936 A.2d at 510.

"An expert fails this standard of certainty if he testifies 'that the alleged cause 'possibly', or 'could have' led to the result, that it 'could very properly account' for the result, or even that it was 'very highly probable' that it caused the result.'" ***Vicari***, 936 A.2d at 510-11 (*quoting* ***Eaddy v. Hamaty***, 694 A.2d 639, 642 (Pa. Super. 1997)). An expert also fails to satisfy the requisite

standard of certainty where that expert's testimony is framed in terms of "more likely than not." **Corrado v. Thomas Jefferson Univ. Hosp.**, 790 A.2d 1022, 1031 (Pa. Super. 2001) (upon reviewing expert's testimony in its entirety, concluding that medical expert did not express the requisite degree of medical certainty where he testified that "more likely than not in my opinion [defendant] deviated from the standard of care")).  However, in **Carrozza**, *supra,* where plaintiff sued radiologist for failing to diagnose a tumor, this Court looked to the testimony in its entirety and found the following expert testimony to be sufficiently definitive: defendant doctor deviated from the standard of care, opinion of what recommendations should have been given by defendant doctor, more likely than not if a biopsy was done earlier cancer would have been found, to a reasonable degree of probability there was cancer in patient's breast at time defendant doctor examined x-ray, within reasonable degree of medical certainty opinion that lesions would have been found if they looked for them earlier. **Carrozza**, 866 A.2d at 381.  In **Vicari**, *supra*, this Court found plaintiff's expert testimony, viewed in its entirety, established his opinion to a reasonable degree of medical certainty, even though he did not use the words "reasonable degree of medical certainty," where he testified to his opinion that plaintiff "absolutely" should have been referred for chemotherapy and explained why, based on the pathology report of plaintiff, that plaintiff was deprived of the opportunity for treatment which increased the risk the cancer would spread, and that there was a deviation from the

standard of care for not referring her for chemotherapy. *Vicari*, 936 A.2d at 511.

On direct examination, Dr. Fullerton testified as follows, relating to Dr. Galinsky:

> Q: Do you have an opinion as to whether or not Dr. Galinsky, [Decedent's] primary care provider, who was her treating physician primarily at The Meadows, did or did not engage in a deviation from the accepted standard of care of medicine at the time that he treated her at The Meadows between August 1 and August 4?
>
> A: Yeah, I mean, I believe that **Dr. Galinsky did deviate from the standard of care** in his treatment of Decedent.

N.T., 3/26/19 (p.m.), at 43 (emphasis added). Dr. Fullerton did testify that Dr. Galinsky "more likely than not" or "possibly" deviated from the standard of care; he affirmatively stated his opinion that Dr. Galinsky did. Dr. Fullerton provided the following additional testimony,

> Q: In what respect, if any, is that your belief, why?
>
> A: I believe that Dr. Galinsky, he initiated therapy with the Xanax without really good what we call medical indication or medical necessity for it. And, number two, he prescribed the Xanax without a real good risk/benefit kind of approach to it. . . . I think the other breach is to add the other benzodiazepine to the Xanax. No matter what the rationale stated, there is just no good reason to have the two of them on board, to have two benzodiazepines. I mean, I think one is not even indicated here . . . the last breach would be the three of them together with no one clear indication for any one of them over this period of time.

*Id*. at 43-44. On cross examination, Dr. Fullerton reiterated his opinion that, "I still disagree with [prescribing] the Seroquel" in addition to the prescription

for Ativan. *Id*. at 89. He unequivocally stated that he disagreed with prescribing the Seroquel and the Ativan. *Id*. at 73, 92. Lastly, he stated "I just don't agree with the whole setup" of Dr. Galinsky prescribing Decedent Ativan, Seroquel and Xanax. *Id*. at 94. Dr. Fullerton's statements that Dr. Galinsky did not have a "really good" medical necessity for prescribing Xanax to Decedent, and did not perform a "real good" risk/benefit approach to prescribing the medication does not detract from the certainty of his opinion that Dr. Galinsky breached the standard of care. "It is for the jury to determine the weight to be given to expert testimony in light of the qualifications shown by the expert witness." *Corrado*, 790 A.2d at 1027 (citation omitted). Dr. Fullerton's opinion that Dr. Galinsky breached the standard of care for a geriatric doctor met the requirement that he give his opinion to a reasonable degree of medical certainty; therefore, grant of nonsuit on this ground was error.[7]

The trial court granted nonsuit in favor of Dr. Megarian on the ground that "[t]here was almost no expert testimony that [Dr. Megarian] committed

---

[7] Plaintiffs also present an argument that nonsuit was improper because it occurred before Plaintiffs closed their case. While nonsuit was granted in favor of Defendants before the close of Plaintiffs' case, the record is clear that the only possible remaining Plaintiffs' witness was a fact witness. N.T., 3/26/19 (9:20 a.m.), at 4-5. Plaintiffs proffered that Ms. Susan Elliott, a caregiver/companion to Decedent, would testify only as to her observations of Decedent at The Meadows. *Id*. The fact that the nonsuit was ruled on before Plaintiffs closed their case was, therefore, not error. *Liles v. Balmer*, 653 A.2d 1237, 1243 (Pa. Super. 1994) (nonsuit was proper, although it occurred before the close of appellants case and before all her evidence was admitted, where appellant had no remaining competent and relevant evidence to present on the issues of negligence and causation).

any violations of the standard of care."  TCO at 9-10.  As to whether Dr.
Megarian breached the standard of care for a geriatric doctor concerning the
prescription and administration of Xanax, Ativan, and Seroquel medications to
Decedent between August 1, 2012 and August 4, 2012, Dr. Fullerton testified:

> Q: The same question about Dr. Megarian, whether or not you
> have an opinion whether or not there is any deviation on his part
> during that period between 8/1 and 8/4, and if so, what is it?
>
> A: Yes, it would be same deviations.  Because he was involved in
> the care and he was close to the timing or the proximity of the
> transfer to the acute hospital, and presumably working with Dr.
> Galinsky, so it would be a similar analysis and similar opinion.

N.T., 3/26/19 (p.m.), at 44-45.  Plaintiffs provided evidence that Dr. Megarian
was Dr. Galinsky's "associate" at The Meadows.  N.T., 3/26/19 (9:20 a.m.),
at 42.  There was testimony that after discussion with Dr. Megarian on August
3, 2012, Decedent agreed to go to Paoli Hospital to be evaluated after falling
earlier that morning.  *Id*. at 42-44.  Lastly, Plaintiffs established that as soon
as Dr. Megarian became aware that Decedent had critical levels of sodium
deficiency, hyponatremia, he sent her back to Paoli Hospital.  *Id*. at 51-52.
Although Dr. Fullerton gave a conclusory opinion that Dr. Megarian breached
the standard of care, there was no evidence that Dr. Megarian did or failed to
do anything contrary to the standard of care to which Dr. Fullerton testified.
The actions established by the testimony above clearly do not establish a
breach of the standard of care to which Dr. Fullerton testified.  Plaintiffs did
not provide testimony of any other actions taken by Dr. Megarian in
connection to Decedent that could establish a breach of the standard of care.

A conclusory statement of breach does not suffice. Accordingly, the nonsuit in regard to Dr. Megarian was properly granted.

Plaintiffs argue that the trial court erred in granting nonsuit in favor of Paoli Hospital because Dr. Fullerton testified to a reasonable degree of medical certainty that Paoli Hospital deviated from the standard of care. "Pennsylvania recognizes the doctrine of corporate negligence as a basis for hospital liability separate from the liability of the practitioners who actually have rendered medical care to a patient." *Rauch v. Mike-Mayer*, 783 A.2d 815, 826–27 (Pa. Super. 2001) (citation omitted). Our law will impose liability if the hospital fails to ensure a patient's safety and well being at the hospital. *Id*. A hospital is directly liable under the doctrine of corporate negligence if it fails to uphold any one of the following four duties:

> 1. a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment;
>
> 2. a duty to select and retain only competent physicians;
>
> 3. a duty to oversee all persons who practice medicine within its walls as to patient care; and
>
> 4. a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

*Scampone v. Highland Park Care Center, LLC*, 57 A.3d 582, 601 (Pa. 2012) (citation omitted). Plaintiffs alleged Paoli Hospital was directly liable for the harm to Decedent for failure to uphold its duty to oversee all persons who practice medicine within its walls as to patient care. To present a *prima*

*facie* case of corporate negligence, a plaintiff must demonstrate all of the following elements:

> 1. [the hospital] acted in deviation from the standard of care;
>
> 2. [the hospital] had actual or constructive notice of the defects or procedures which created the harm; and
>
> 3. the conduct was a substantial factor in bringing about the harm.

***Seels v. Tenet Health System Hahnemann, LLC***, 167 A.3d 190, 205 (Pa. Super. 2017) (citation omitted).  "Unless a hospital's negligence is obvious, an expert witness is required to establish two of these three elements: that the hospital deviated from the standard of care and that the deviation was a substantial factor in bringing about the harm." ***Id***.  Constructive notice can be shown when a hospital should have known of the patient's condition. ***Krapf v. St. Luke's Hospital***, 4 A.3d 642, 653 (Pa. Super. 2010).  "Constructive notice must be imposed when the failure to receive actual notice is caused by the absence of supervision." ***Id***. (citation omitted).

The trial court granted nonsuit in favor of Paoli Hospital on the grounds that Plaintiffs failed to establish how Paoli Hospital deviated from the standard of care and also failed to establish that Paoli Hospital knew or should have known of the alleged breaches.  TCO at 3-4.  The trial court found significant that Dr. Fullerton never reviewed any policies or procedures from Paoli Hospital.  ***Id***. at 3-4.

As to the corporate negligence claim against Paoli Hospital, Dr. Fullerton testified as follows:

Q: Now, I am going to change gears and ask you questions about Paoli Hospital and whether or not you have an opinion as to whether the hospital met its duty to oversee all persons who practiced medicine within its walls as to patient care?

. . .

A: So, yes, in terms of, again this area where I am not talking about policies and procedures per se, okay, because I don't know what they are, but I am talking about when Decedent arrives at Paoli and there is a differential diagnosis within the differential of pneumonia, CHF, congestive heart failure, and that basket of possibilities is just there and never approached as a basket of possibilities, especially the possibilities connected to known accepted side effects of the psychoactive medications that were prescribed that originated, you know, at The Meadows between the first and fourth of August and were continued it looks like, I mean it is for sure, at Paoli.

Q: Did Paoli uphold its standard of care owed to the patient to ensure patient safety and well-being at that facility?

. . .

A: Based on my review it is my medical expert opinion based on a reasonable degree of medical certainty that there were violations of standard of care involving the institutions, the nursing home and the hospital.

N.T., 3/26/19 (p.m.), at 45-48.

While Dr. Fullerton expressed a conclusory opinion that Paoli Hospital breached the standard of care, he did not explain the standard of care for Paoli Hospital nor what the hospital did or did not do that would support his opinion that it breached its duty of care. Plaintiffs did not establish the necessary notice element of corporate negligence, that Paoli Hospital had actual or

- 14 -

constructive notice of any defects or procedures which created harm to Decedent. *See Edwards v. Brandywine Hospital*, 652 A.2d 1382, 1387 (Pa. Super. 1995) (hospital could not be charged with constructive notice of an error where appellant did not introduce any evidence that the hospital as an entity knew or should have known about a mistake made by the Emergency Room doctor). In fact, Dr. Fullerton admitted he did not know the policies and procedures at Paoli Hospital. N.T., 3/26/19 (p.m.), at 45-46. As Plaintiffs were unable to present the necessary elements of the corporate negligence claim, nonsuit was properly granted in favor of Paoli Hospital.

As noted above, the trial court erred in holding that the expert testimony that Dr. Galinsky breached the standard of care was insufficient. The trial court also concluded in its opinion that nonsuit was properly granted in favor of Defendants because Plaintiffs did not introduce expert testimony as to causation. Plaintiffs argue the absence of causation evidence was caused by the trial court's precluding Dr. Fullerton from testifying as to cause of death and that this evidentiary ruling was error. Plaintiffs argue that Dr. Fullerton was precluded from testifying as to areas that were included within the expertise of persons certified in internal medicine and geriatric medicine, in which Dr. Fullerton was admittedly qualified.

> We may reverse the trial court's decision regarding admission of expert testimony only if we find an abuse of discretion or error of law. . . . [B]ecause the issue regarding an expert's qualifications under the MCARE Act involves statutory interpretation, our review is plenary.

*Frey v. Potorski*, 145 A.3d 1171, 1176 (Pa. Super. 2016) (citation omitted).

We conclude that the trial court committed an error of law in ruling that Dr. Fullerton was precluded from testifying to Decedent's cause of death and as to the areas of cardiology, pulmonology, and nephrology as they relate to causation. As noted above, the trial court based its limitation of Dr. Fullerton's testimony on the MCARE Act. By passing the MCARE Act, the General Assembly established a "more stringent standard for admissibility of medical expert testimony in a medical malpractice action." *Frey*, 145 A.3d at 1177. The MCARE Act states:

> (a) **General rule**.--No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.
>
> (b) **Medical testimony**.--An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:
>
> (1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.
>
> (2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

40 P.S. § 1303.512(a)-(b). The MCARE Act has additional requirements for a doctor testifying against another doctor in a medical malpractice case when describing the appropriate standard of care,

> (c) **Standard of care**.--In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

- 16 -

(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

…

(e) **Otherwise adequate training, experience and knowledge**.--A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.

40 P.S. § 1303.512(c), (e).

The trial court's evidentiary ruling was erroneous. The precluded testimony with respect to Dr. Galinsky related to causation, not standard of care. Dr. Fullerton was only required to meet the qualifications set forth in § 1303.512(a) & (b) and he did so. During *voir dire*, Dr. Fullerton testified to the following. He has an active license to practice medicine in California and Florida. N.T., 3/26/19 (11:23 a.m.), at 5. Over the period of time the incident occurred, he was board certified in internal medicine and geriatrics, hospice and palliative medicine and addiction medicine. *Id*. at 6-7. Over the last 25 years, he has been a medical director at skilled nursing facilities, long-term care facilities, assisted-living facilities, and dementia units. *Id*. at 7. In 2012,

he was working as a medical director of six facilities. *Id*. Dr. Fullerton testified that over the past 25 years he has taught physicians assistant students, nurse practitioner students and medical students. *Id*. at 8-9. He was also director of a training program in geriatrics, medical faculty, internal medicine, and palliative medicine. *Id*. at 9. Dr. Fullerton testified that being the director of training programs in the area of geriatrics requires "a lot of rounding with the medical residents and medical students that are in the hospital in going through the different units and being involved with interfacing with pulmonary, cardiology, GI, hematology . . as specialists." *Id*. He was at the time of trial a director at St. Mary's hospital in San Francisco in geriatrics, palliative medicine and addiction. *Id*. at 9-10. He maintained several active offices for the practice of medicine, including one within an assisted-living facility. *Id*. at 12. He has testified as an expert witness in medical matters over 150 times in the past 20 years of his practice. *Id*. at 13. He has previously testified about the entire body of the geriatric patient and the systems of that body. *Id*. at 14. Dr. Fullerton testified on cross-examination that "as a geriatric specialist, I work in the cardiology area of geriatrics, the pulmonary area of geriatrics, the nephrology area of geriatrics, and I've testified in those areas." *Id*. at 28.

Dr. Fullerton's *vior dire* testimony demonstrated that he possessed sufficient education, training, knowledge and experience to provide credible, competent testimony, that he held an unrestricted physician's license to practice medicine in California and Florida, and that he was actively engaged

in clinical practice, thus satisfying the MCARE Act in regard to his testifying "on a medical matter . . . including risks and alternatives, causation and the nature and extent of the injury" to Decedent. 40 P.S. § 1303.512(a)-(b). As an expert in internal and geriatric medicine, Dr. Fullerton was qualified to testify as to matters of the body that were contained within internal and geriatric medicine.

> In the area of medicine, specialties sometimes overlap and a practitioner may be knowledgeable in more than one field. While different doctors will have different qualifications and some doctors are more qualified than others to testify about certain medical practices, it is for the jury to determine the weight to be given to expert testimony in light of the qualifications shown by the expert witness.

*Corrado*, 790 A.2d at 1027 (citations omitted).

The trial court's ruling prevented Plaintiffs from presenting evidence of causation and the nature and extent of the injury to Decedent, including the cause of her death, the manner of her death and even the very fact that she died. Because the Plaintiffs' absence of evidence on causation and the nature and extent of the injuries to Decedent, including the manner and fact of her death, was caused by the trial court's erroneous evidentiary ruling, nonsuit cannot be sustained on the ground that Plaintiffs failed to prove causation.[8]

---

[8] We note that a review of the trial transcripts reveal that the trial court did not preclude Plaintiffs from presenting testimony as to the propriety of treatment at Paoli Hospital. *See* N.T., 3/26/19 (p.m.), at 4-6 (the trial court ruled Plaintiffs "can go into the propriety of the treatment at Paoli, but the other areas you should stay away from.") Although it appears Plaintiffs were

Because Plaintiffs introduced sufficient competent expert testimony that Dr. Galinsky breached the standard of care and Plaintiffs' failure to prove causation was caused by the trial court's erroneous evidentiary ruling, the nonsuit in favor of Dr. Galinsky must be reversed. Because Plaintiffs failed to introduce competent expert evidence that Dr. Megarian and Paoli Hospital breached the standard of care, we affirm nonsuit as to these two defendants.

Reversed and remanded for a new trial with regard to Dr. Galinsky. Order affirmed with regard to Paoli Hospital and Dr. Megarian. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/27/2020

---

erroneously precluded from presenting testimony of *causation* as to Paoli Hospital, N.T., 3/26/19 (p.m.), at 46-48, this does not affect our decision that nonsuit was proper as to Paoli Hospital as discussed above. The trial court's erroneous evidentiary ruling did not affect the Plaintiffs' ability to present evidence of Paoli Hospital's breach of its duty and any notice it had of defects.